This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant-defendant Frank Belter appeals his convictions on three counts of gross sexual imposition. This Court affirms.
 I.
This case involves allegations by five brothers that they were sexually abused by Belter. The brothers are all within four years of age of one another and were all between third and sixth grade at the time of the abuse.
During the spring and summer of 1996, the brothers spent a great deal of time with Belter: the two youngest brothers were being coached by Belter in a youth soccer league, Belter took various brothers to the movies and out for dinner on several occasions, all five brothers frequently went to Belter's house to do yard work for Belter, Belter took the brothers and some of his other soccer players to an amusement park, and all five brothers spent the night at Belter's house on several occasions. All of this was with the consent of the brothers' mother and was often at the request of the brothers.
The brothers claimed that, sometime during the summer of 1996, Belter began to sexually abuse them during the sleepovers and occasionally while they were at Belter's house doing yard work. It was alleged that Belter frequently slept on the pullout sofa bed along with the brothers. One brother claimed that Belter attempted to touch his penis while they slept and, when he confronted Belter about it, Belter said that he had a disease in his hand that made it jump around when he was sleeping. The other brothers claimed similar experiences. Additionally, the youngest brother claimed that he awoke once to find Belter performing fellatio on him. The oldest brother claimed that Belter once put his thumb on the oldest brother's penis as Belter reached over to pull lint out of the oldest brother's belly button. The oldest brother claimed that Belter then left his hand there for one-half hour and used his thumb to rub the oldest brother's penis. At least one brother claimed that Belter kissed him on the cheek once when they were wrestling on his living room floor and another brother claimed that Belter kissed him on the mouth. One brother claimed that he once took a shower at Belter's house after working in the yard and that Belter stepped into the shower with him afterwards and wanted to dry him off.
These allegations did not come to light until Thanksgiving 1996, when some of the brothers invited their maternal uncle, James, over to their house to see their new video game. Two of the brothers were playing the game upstairs and the youngest brother followed James upstairs to watch. James watched the two brothers play the game for a short period of time and then asked them about soccer and whether Belter was still their coach. The brothers said that they were not happy with Belter. When James asked them why, one of them said that Belter "is a fag." James asked him why he said that, and the two brothers explained that they had been sexually abused by Belter. James then noticed that the youngest brother was no longer with them. James found the youngest brother downstairs watching television with a glazed look in his eyes. James asked the youngest brother if something was wrong and the youngest brother said no, that he was fine.
James then went to the brothers' mother and told her what he had heard about Belter. She was concerned and the two developed a plan for confronting the brothers about the abuse. James decided that he would pull each brother aside and question them individually about Belter, starting with the youngest brother and working his way up to the oldest. James took the youngest brother on a hunting trip the next day. After the hunting trip, when they had returned to James' house, James questioned the youngest brother about Belter. James first told the youngest brother that he had heard from the other brothers that Belter was acting improperly. James then told the youngest brother not to worry about what had happened to the other brothers, that he just wanted to hear what had happened to him. The youngest brother was initially reluctant to say anything, but eventually he started talking about the sexual abuse.
Because James had a busy work schedule, he was unable to meet with the next youngest brother until a few weeks later during Christmas break. James testified that the next youngest brother shied away from the subject and did not want to be bothered about it. It took fifteen to twenty minutes before the next youngest brother said anything at all about the abuse. The next brother to be questioned was furious. Around New Years day, James spoke with the fourth brother. The fourth brother denied that anything had happened with Belter and was angry that James had raised the subject. During the first part of January, James finally met with the oldest brother. The oldest brother had already told his mother that Belter had touched him improperly, but he was embarrassed to discuss it with James. Two of the brothers continued to play indoor soccer for Belter throughout this period of time.
Once all of the brothers had admitted to being sexually abused by Belter, James and their mother went to the police. They purposely waited until all the brothers had admitted to the abuse before they went to the police. By the time they went to the police, the indoor soccer season was almost over, so the police told them to keep the brothers on Belter's soccer team for the last two weeks. Between the time when they first went to the police and the time when the police interviewed James, James spoke with the brothers two or three more times.
While the investigation proceeded, one of the brothers began to exhibit some minor behavioral problems at school and some of the brothers' grades dropped. As a result, the brothers were sent to a psychiatric social worker, Robert Bell, for assessment, diagnosis, and treatment. After a few short sessions, Bell and the parents mutually agreed to end the sessions. The brothers all thought that what had happened was disgusting and they were angry about it, but none of them thought that they needed counseling. The brothers also were not showing any significant behavioral problems at home or at school.
Belter was eventually indicted on three counts of gross sexual imposition, two counts of attempted gross sexual imposition, and two counts of rape. Belter pled not guilty to all the counts. One count of rape was dismissed by the prosecution and the jury acquitted Belter of the remaining count of rape. The jury found Belter guilty of the three counts of gross sexual imposition, but not guilty of the two counts of attempted gross sexual imposition. Belter appealed.
 II.
Belter's first assignment of error states:
 THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT-APPELLANT THE RIGHT TO PRODUCE TESTIMONY FROM A WITNESS THAT ESTABLISHED A DEFENSE TO THE CHARGES.
Several parents of other children that Belter had coached in soccer testified on Belter's behalf. One of those parents attempted to testify about something that she had overheard the brothers' father saying to another father about Belter during one of the soccer games in the spring of 1996. The prosecution objected to this testimony and the trial court had the witness describe her testimony outside the presence of the jury. The witness stated as follows:
 I was sitting on a log and [the boys' father] was standing right directly behind me and he was speaking with another father, * * *, and he started talking about [Belter].
 And he said that [Belter] owed his boys money and that he had confronted [Belter] about it, and that [Belter] said he did not owe him money.
 And he said, well, that yes you do owe him money — them money, and he said — [Belter] said, "I don't owe them anymore [sic] than twenty dollars."
 And he said, "You owe them a lot more than that," and he said — and [Belter] said, "No, I don't."
 And he said, well, that he would get it out of him one way or another.
And [Belter] said, "What's that supposed to mean?"
And he said, "You will see."
 And then he went on to say that he can't get a girl friend, he's nothing but a fag. All's he does is hang around little boys.
 And I wanted to turn around and ask him "Then why do you send your kids there?" But I kept my mouth shut. I didn't say a word. And then when this came out, that's why I have questions of is this true or not.
After hearing this testimony, the trial court sustained the prosecution's objection, stating:
 The Court has had testimony from each of the * * * boys that they got paid by Mr. Belter. There was never any question from any of them that they were — thought they were still owed money or anything.
 [The father] is not a victim in this case. The boys are. There's no evidence that the boys were present during this conversation; that any of this was ever said to the boys.
 The Court has serious doubts about when this conversation, if it occurred, occurred. The Court finds it to be hearsay. The Court is not allowing it in. If any value it has, it's certainly more prejudicial than probative of anything. And for all of these reasons, the Court is not allowing this in.
Belter argues that this testimony should have been admitted into evidence.
Evid.R. 801(C) define hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Clearly, Belter does not seek to prove the truth of the father's assertions that Belter still owes the boys money or that Belter is a "fag" who "can't get a girlfriend" and just "hang[s] around little boys." As such, none of these assertions are hearsay. The only portion of the previous statement that is arguably hearsay is the portion wherein the father states that he will make Belter pay "one way or another." Belter may have been seeking to prove the truth of that assertion, that the father encouraged the brothers to make these accusations in order to get even with Belter. However, this statement fits under the hearsay exception for a then existing mental or emotional condition, which specifically permits the admission of statements of "intent, plan, motive, design." Evid.R. 803(3). As such, the entire statement was admissible under the hearsay rules.
However, the trial court also appears to have denied the admission of this testimony because its probative value was outweighed by the threat of prejudice. Under Evid.R. 403(A), evidence that is otherwise relevant must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
"The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus.
 "Abuse of discretion, and especially gross and palpable abuse of discretion, which are the terms ordinarily employed to justify an interference with the exercise of discretionary power, implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency."
State ex rel. Shafer v. Ohio Turnpike Commission (1953), 159 Ohio St. 581,590-591, quoting People v. N.Y.C. Rd. Co. (1864),29 N.Y 418, 431.
In the instant case, the probative value of the proffered testimony was tenuous and it did have some potential to confuse or mislead the jury. As such, this Court cannot say that the trial court acted with perversity of will, passion, prejudice, partiality, or moral delinquency when it exercised its discretion and excluded the testimony. Assignment of error number one is not well taken.
 III.
Belter's second assignment of error states:
 THE JUDGMENT OF CONVICTION ON THREE COUNTS OF GROSS SEXUAL IMPOSITION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The appropriate standard of review for a challenge to the weight of the evidence is set forth in State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
In the instant case, Belter was convicted of violating R.C.2907.05, which provides:
 (A) No person shall have sexual contact with another, not the spouse of the offender [or] cause another, not the spouse of the offender, to have sexual contact with the offender * * * when any of the following applies:
* * *
 (4) The other person, or one of the other persons, is less than thirteen years of age * * *.
As previously noted, the brothers testified to activity that would clearly be prohibited by R.C. 2907.05. Belter's testimony, however, presented a different story. Belter testified that the brothers only spent the night at his house approximately seven times and Belter denied all of the specific acts of abuse that were alleged by the brothers. Additionally, parents of other children that played soccer for Belter testified on behalf of Belter. They described a coach who cared about his players and enjoyed spending time with them outside of practice. These parents testified that their children had spent the night at Belter's house, but that they had never suspected that anything improper occurred during the sleepovers. On appeal, Belter essentially argues that his testimony was more credible than that of the brothers.
Despite our role as a "thirteenth juror," it is primarily the jury's duty to assess the credibility of the witnesses. State v.DeHass (1967), 10 Ohio St.2d 230, 231. The jury is able to observe the witnesses testify and can evaluate body language, voice inflection, and facial expressions. These are valuable tools for assessing credibility; tools which are not available to an appellate court working from the record alone. As such, a jury's assessment of credibility is entitled to considerable deference. See Thompkins, supra, at 390 (Cook, J., concurring).
The deference that is due a jury's assessment of credibility is reflected in the limitation placed on an appellate court in reviewing the jury's resolution of conflicting testimony. An appellate court does not have free reign to engage in a de novo
review of the jury's resolution of conflicting testimony. Instead, appellate courts are only permitted to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, supra, at 387.
In light of our deferential standard of review, this Court cannot conclude that this is one of the exceptional cases in which the evidence weighs so heavily against the convictions that a new trial should be ordered. By acquitting Belter of one-half of the pending charges, the jury apparently subjected the brothers' testimony to a critical examination, ultimately disregarding some of the testimony. From a review of the record on appeal, this Court cannot conclude that the jury clearly lost its way when it resolved the conflicting testimony in the manner in which it did. Assignment of error number two is not well taken.
 IV.
Belter's third assignment of error states:
 THE JUDGMENT ENTRY WHICH DETERMINES THE DEFENDANT-APPELLANT TO BE A "SEXUALLY ORIENTED OFFENDER" VIOLATES ARTICLE II, SEC. 28 OF THE OHIO CONSTITUTION AND ARTICLE I, SECTION 10 OF THE UNITED STATES CONSTITUTION.
Under this assignment of error Belter relies on State v. Cook
(Aug. 7, 1997), Allen App. No. 1-97-21, unreported, in arguing that his classification as a sexually oriented offender violates the ex post facto clauses of both the Ohio and the United States Constitutions. However, Cook was subsequently reversed by the Supreme Court of Ohio. See State v. Cook (1998), 83 Ohio St.3d 404.
This Court has previously rejected Belter's argument. SeeState v. Buchanan (June 16, 1999), Summit App. No. 19005, unreported. As such, assignment of error number three is not well taken.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Medina, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellant.
Exceptions.
 ___________________________ DONNA J. CARR
FOR THE COURT
SLABY, P. J.
BATCHELDER, J.
CONCUR